**IN THE COURT OF APPEALS OF IOWA**

No. 14-1015
Filed October 1, 2014

**IN THE INTEREST OF K.G.,**
**Minor Child,**

**A.S., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Johnson County, Deborah Farmer

Minot, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Ellen R. Ramsey-Kacena, Cedar Rapids, for appellant mother.

Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant Attorney

General, Janet M. Lyness, County Attorney, and Emily Voss, Assistant County

Attorney, for appellee State.

Anthony Haughton of Linn County Advocate, Cedar Rapids, attorney and

guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Doyle and McDonald, JJ.

**DOYLE, J.**

A.S. appeals the termination of her parental rights to her child, K.G. She contends (1) the State did not provide reasonable services to facilitate reunification with the child, and (2) termination of her parental rights was not in the child's best interests. Reviewing her claims de novo, *see In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014), we affirm.

### I. *Background Facts and Proceedings*.

The child at issue here, born in 2006, first came to the attention of the Iowa Department of Human Services (DHS) in 2007 when he was but a baby. Since that time, the child has thrice been adjudicated a child in need of assistance (CINA) because of the mother's substance abuse and illegal activities, as well as her association with unsafe persons and her lack of proper supervision of the child. Additionally, since 2007, the mother has been offered numerous services to reunify her and the child. Twice previously, the mother availed herself of the services offered, maintaining sobriety such that the child could be returned to her care and the CINA cases closed. However, in 2010, the mother admitted she and her paramour were selling drugs, leading once again to DHS intervention and the offering of reunification services. The child was placed in the custody of his father in October 2010, where the child has since remained.[1]

The mother pled guilty to a felony-drug charge and to child endangerment in 2011, and she was placed on probation. Though it appeared the mother was not abusing substances, she continued associating with unsafe men. In February 2012, the juvenile court terminated the mother's parental rights to the

---

[1] The father's parental rights are not at issue in this appeal.

child's younger half-sibling, born in 2010, due to the mother's continued and concealed relationship with a convicted sex offender, explaining:

> In the final analysis, [the mother's] judgment is so poor and her need for male companionship so great that she cannot put the safety and well-being of her children ahead of her own needs. Truly, in considering [the mother's] decisions, all of the possibilities are bleak. . . . If [the mother] was involved with [her sex-offender fiancé] in September [2011], she lied to the court. If the relationship did not start until much later, she became engaged to a man she hardly knew. The only conclusion that can be reached is that none of these things mattered at all to [the mother].

Presumably, termination of the mother's parental rights to the child at issue here was not sought at that time because the child was in his father's custody. Nevertheless, despite the remaining possibility of reunification with the child, the mother admitted in July 2012 she had been using synthetic marijuana for a year at that point. She also admitted she had resumed her relationship with a former substance-abusing paramour. The mother was permitted to continue visitation, with visits being held in a public place and fully supervised.

Starting in December 2012, visitation issues began. Though some missed visits were not the mother's fault, like instances of bad-weather and illness of both the mother and the child, the mother also simply failed to show up for some visits. The child struggled with his mother's frequent absences and sudden re-involvement in his life, including pant-wetting issues, behavioral and anger issues at school, and even asking teachers if they would be his mother and telling others his mother was dead. The DHS then reduced the mother's visitation from once a week to twice a month, with the prerequisite that the mother call and confirm the visit prior to the visit so that the child would not be disappointed.

Shortly thereafter, in March 2013, the mother attempted to overdose and tested positive for cocaine. She was placed in jail for violating the terms of her probation, and visitation was stopped altogether. The mother was permitted to participate in drug court, and she stayed clean for a number of months, until September 2013. During that period of sobriety, she requested the DHS and the court reinstate her visitation with the child. The child's guardian ad litem recommended against visitation, but the DHS case worker told the mother if she could consistently write a letter a week to the child, the letters would be given to the child and then, if the child was okay thereafter, visitation might start again. She did not do so consistently. After she relapsed in September 2013, she was discharged unsuccessfully from drug court and incarcerated. She is presently serving her prison sentence and has a tentative discharge date of December 2014. She requested but was not permitted visitation with the child in prison.

After she was incarcerated, the State filed a petition for termination of her parental rights. A hearing was held in April 2014, and the mother testified she had been sober since incarcerated and had changed. However, she admitted that prior to incarceration, she had been involved with another man with a significant criminal history. She testified she broke up with him after she learned he was abusive, but she admitted she never asked him about his past or reported the relationship to her drug-court team as required. The DHS caseworker and the child's guardian ad litem recommended termination of her parental rights, noting the child was doing well now and needed permanency.

Thereafter, the court entered its order terminating her parental rights. The court detailed the numerous reunification services offered or provided to the

mother since 2007, and it was unconvinced that she had changed in prison such

that permanency for the child should be delayed any further:

> The hope that [the mother] can become even a marginally adequate parent is long gone. Her testimony establishes that she has no insight into the pain that she has cause [her child], nor any realistic plan to take the steps necessary to protect him from herself, much less others. In 2010, the court was convinced by [the mother's] apparent sincerity and her clear determination to change. In 2014, her words ring hollow. For [the mother], every day is a new day. The promise of change is all that matters. The past is gone. She deserves a "fresh start," regardless of the harm she has caused. Despite her claim that she is taking responsibility, nothing could be further from the truth. She incessantly rationalizes her behavior. Her focus remains exclusively on herself. It was striking that she cried and whimpered throughout her testimony when she was talking about how painful it was for her not to see [the child], while minimizing his pain. To [the mother], [the child's] fear that she had died because she was missing visits was proof of his love for her. To the court, it was proof of how deeply he was suffering.
>
> In 2011, when [the mother] was given another chance, she threw it away by becoming engaged to a twice-convicted child sex offender. In 2013, when given the chance to avoid prison by participating in drug court, she became involved with a repeat felon, failed to disclose that relationship to her treatment team, and committed multiple probation violations. [The mother's] "consistent inconsistency" is so pervasive that even while sitting in jail and prison, she could not manage to write one letter per week to her son. As much as anything, that failure sums up the hopelessness of her parenting. The court finds no evidence that [the mother] can have a safe, loving, trusting relationship with [the child], much less parent him. She cannot protect him from her own substance abuse, criminal activity, and dangerous associates. [The child] would be at imminent risk of physical harm if he were to be in his mother's care for even a short time without supervision. Since [the mother] will undoubtedly seek to have contact with [the child] without regard for his best interests, he will be at imminent risk of emotional harm if she retains even a modicum of legal authority over him. [The child] deserves the opportunity to spend the rest of his childhood safe from the risk of further trauma and pain as a result of his mother.

The mother now appeals, asserting reasonable services were not provided to her for reunification and that termination of her parental rights is not in the child's best interests. We address her arguments in turn.

## II. Discussion.

In determining whether parental rights should be terminated under chapter 232, the juvenile court "follows a three-step analysis." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Step one requires the court to "determine if a ground for termination under [Iowa Code] section 232.116(1) [(2013)] has been established" by the State. *Id.* If the court finds grounds for termination, the court moves to the second step of the analysis: deciding if the grounds for termination should result in a termination of parental rights under the best-interest framework set out in section 232.116(2). *Id.* at 706-07. Even if the court finds "the statutory best-interest framework supports termination of parental rights," the court must proceed to the third and final step: considering "if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights." *Id.* at 707.

### A. Reasonable Services.

When a child is removed from the parent's care, the State is responsible for making "every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interest of the child." Iowa Code § 232.102(7). "Reasonable efforts" means those efforts that "make it possible for the child to safely return to the family's home." *Id.* § 232.102(10)(a). The State must exert reasonable efforts to reunite parent and child before parental rights are terminated. *In re A.B.*, 554 N.W.2d 291, 294 (Iowa Ct. App. 1996). What

constitutes reasonable services varies, depending on the requirements of each case. *In re C.H.*, 652 N.W.2d 144, 147 (Iowa 2002) (noting focus is generally on services to improve parenting). The State is only required to supply those services that are reasonable under the circumstances. *In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000). When determining whether reasonable efforts were made, the court must consider the type, intensity, and duration of services offered and the relative risk of the child remaining with the parents versus removal. Iowa Code § 232.102(10)(a). "The concept of reasonable efforts broadly includes a visitation agreement designed to facilitate reunification while protecting the child from the harm responsible for the removal." *C.H.*, 652 N.W.2d at 147 (internal quotation marks omitted).

The mother asserts the State failed to make reasonable efforts for her reunification with the child because her requests for reinstatement of visitation in 2013, while she was participating in drug court, and in 2014, after she was incarcerated, were not granted and the permanency goal was changed to unification with the father only. However, the overwhelming evidence here establishes the State made reasonable efforts for reunification in this case.

Our de novo review of the record reveals the mother has faced many hardships in her life. Unfortunately, despite completion of numerous substance-abuse-treatment programs and the offer or receipt of other services, the mother has demonstrated a pattern of using illegal substances as a coping mechanism, creating a continuous cycle. Her substance abuse has led to poor decision making and has put her children's lives at risk. This has necessitated intervention by the DHS and juvenile court, leading to the offer and receipt of

substance-abuse treatment and other numerous services. She has been able to maintain some semblance of sobriety in a structured environment, but once she progresses to a point of some independence, at the first test, she falls back on old bad habits, causing the entire cycle to repeat. There is no question this child has been affected by his mother's inability to put him first in her life over substances and unsafe persons. Given the child's ongoing issues, along with the mother's continued substance abuse and involvement in unsafe relationships, we do not find that by March 2013, it was unreasonable to deny the mother visitation until she could establish consistency. It is clear that the juvenile court and the DHS went above and beyond to try to keep the mother and child together, but the mother's own conduct against the child's best interests required changing the permanency goal in the case and stopping visitation altogether. There is no question that reasonable efforts were made in this case. We therefore affirm on this issue.

### B. Best Interests.

The mother does not challenge the statutory grounds found for supporting termination of her parental rights. However, despite seven years of DHS and juvenile court involvement with her family, she contends termination of her parental rights is not in the child's best interests. Upon our de novo review, we agree with the juvenile court that termination of her parental rights is in the child's best interest.

There is no question maintaining sobriety is lifelong battle; however, this hardship should not transfer to the child, who has been waiting almost all of his eight year of life for her to put him first. *See In re E.K.*, 568 N.W.2d 829, 831

(Iowa Ct. App. 1997) ("We must reasonably limit the time for parents to be in a position to assume care of their children because patience with parents can soon translate into intolerable hardship for the children."). This child deserves permanency now, and the mother has been given more than enough time and chances to establish she could maintain her sobriety and put the child first. The child is doing well in the consistent care of his father. This is one of those cases where termination of one parent's parental rights is in the child's best interests.

Furthermore, we do not find the relationship between the mother and child outweighs the child's needs for permanency. As so aptly put by the DHS caseworker, there is no question the mother and child love each other. But love is simply not enough on the mother's part; a parent must also put the needs of the child before their own. The mother has not done this, even after seven years. Consequently, we agree with the juvenile court that termination of the mother's parental rights was in the child's best interest.

### III. Conclusion.

For these reason, we affirm the juvenile court's ruling terminating the mother's parental rights.

**AFFIRMED.**